1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOWLER PACKING COMPANY, INC., | No. 1:16-cv-00106-DAD-SAB |
| Plaintiff, | |
| v. | ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| DAVID M. LANIER, et al., | |
| Defendants. | (Doc. Nos. 62, 64) |

This case is before this court following the Ninth Circuit's decision and order of remand issued on December 20, 2016 and its mandate issued on March 28, 2017. (Doc. Nos. 42, 49); *Fowler Packing Co., Inc., et al. v. Lanier, et al.*, 844 F.3d 809 (9th Cir. 2016). Following remand, defendants filed a motion for summary judgment. (Doc. No. 64.) Plaintiff Fowler Packing Company, Inc. ("Fowler") also moved for summary judgment in its favor. (Doc. No. 62.)[1] Oppositions and replies were filed in connection with the cross-motions, as was an amicus brief on behalf of the class of certified workers in two actions that were then pending before this court. (Doc. Nos. 65, 66, 67, 71, 73, 74.) A hearing on the pending motions was held on

---

[1] Plaintiff's motion for summary judgment was also brought by plaintiff Gerawan Farming, Inc. ("Gerawan"), but plaintiff Gerawan's claims in this action were dismissed with prejudice pursuant to a stipulation filed by the parties on November 10, 2022. (Doc. Nos. 96, 97.) Plaintiff Gerawan was therefore terminated as a named plaintiff in this action on November 14, 2022. (Doc. No. 97.) Accordingly, the court will address plaintiff's pending motion for summary judgment only as to the claims brought by plaintiff Fowler.

1

1    November 21, 2017.  (Doc. No. 76.)  Attorneys David Schwarz and Michael Harbour appeared on

2    behalf of plaintiffs, and California Deputy Attorney Generals Mark Beckington and Thomas

3    Patton appeared on behalf of defendants.  Attorney Mario Martinez, counsel for *amici curiae*, also

4    appeared at that hearing.  As will be addressed in more detail below, this court held a further

5    hearing on the pending motions on May 22, 2023.  (Doc. No. 108.)  For the reasons explained

6    below, the court will deny defendants' motion for summary judgment in its entirety and grant

7    plaintiff Fowler's motion for summary judgment in part.

8                                            **BACKGROUND**

9            With their cross-motions for summary judgment, the parties submitted a joint statement of

10   stipulated facts in lieu of separate statements of undisputed facts.  (Doc. No. 62-2.)[2]  The facts

11   summarized below are largely derived from the parties' joint statement of stipulated facts as well

12   as additional facts the court has considered as noted.

13   **A.       Piece-Rate Compensation and AB 1513**

14           This case concerns California legislation addressing the piece-rate compensation of

15   employees.  Piece-rate compensation involves a method of calculating compensation based on the

16   type and number of tasks completed rather than by the number of hours worked.  *See Gonzalez v.*

17   *Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 41 (2013) (describing how an employer

18   compensated automotive service technicians based on the number of hours that the company

19   determined was appropriate to spend on a task, regardless of how long the technician actually

20   spent to complete that task); *Bluford v. Safeway Stores, Inc.*, 216 Cal. App. 4th 864, 867 (2013)

21   (describing how an employer compensated truck drivers based on miles driven and specific tasks

22   performed).

23           In 2002, the California Industrial Welfare Commission promulgated Wage Order No. 4,

24   which provided that "[e]very employer shall pay to each employee, on the established payday for

25   the period involved, not less than the applicable minimum wage for all hours worked in the

26   _____

27   [2]  The parties agreed to forgo separate statements as unnecessary in light of the stipulated facts
     and agreed that their respective cross motions for summary judgment may properly be decided
     based upon the joint statement of stipulated facts, the papers and pleadings, and other material of

28   which the court may take judicial notice.  (Doc. No. 62-2.)

1    payroll period, whether the remuneration is measured by time, piece, commission, or otherwise."

2    Cal. Code Regs. tit. 8, § 11040(4)(B).  In the piece-rate compensation context, it is not

3    immediately apparent that an employee, who is paid on a per-task basis, is being compensated in

4    accordance with minimum wage laws, which requires payment on a per-hour basis.  Prior to the

5    decisions issued in 2013 by the California Court of Appeal in *Gonzalez* and *Bluford*, some

6    employers implemented a practice of adhering to a "minimum wage floor" by multiplying the

7    number of hours worked by the applicable minimum wage.  If an employee's compensation under

8    a piece-rate compensation system did not exceed the minimum wage floor over a particular

9    period of time, her compensation would be supplemented by the employer up to the minimum

10   wage floor.  *See Gonzalez*, 215 Cal. App. 4th at 41–42.

11           1.      *Gonzalez* and *Bluford*

12           As noted above, in the spring of 2013, California appellate courts issued two decisions

13   concerning the application of California's minimum wage laws to piece-rate compensation for

14   nonproductive time.  In these two decisions, *Gonzalez* and *Bluford*, the state appellate court held

15   that employees who are paid on a piece-rate basis are entitled to separate hourly compensation for

16   rest breaks and nonproductive time, including time spent waiting for tasks, attending meetings

17   and trainings, or performing other work for an employer.  Additionally, the decisions held that

18   employers who compensated employees on a piece-rate basis faced, at a minimum, potential

19   liability for paying employees less than the minimum wage, producing an incorrect wage stub,

20   and failing to provide paid rest breaks.  Such violations also were found to trigger a statutory

21   penalty, creating substantial potential liability for employers paying their employees on a piece-

22   rate basis.

23           2.      Legislative History of AB 1513

24            On or about August 28, 2014, a draft of proposed legislation (the "Draft Legislation")

25   was circulated to certain members of the California Legislature with the intention of addressing

26   the *Gonzalez* and *Bluford* decisions.  Stakeholders and legislators were concerned regarding the

27   impact of the decisions on employers, given the significant potential liability that application of

28   those decisions could impose upon them and the increase in litigation that immediately followed

3

those appellate court decisions.  Therefore, the drafters of the proposed legislation included a safe harbor provision, namely an affirmative defense that could be asserted in certain circumstances, with the intent to provide an option for California businesses facing unanticipated and significant potential liability arising from the application of those two then-recent decisions.

The Draft Legislation sought to address, among other things, whether the affirmative defense provisions would be applicable to any pending litigation, and what limitations should be established.  The resulting draft thus provided that the affirmative defense provisions would not apply to:

> (1) Damages and penalties previously awarded in an order or judgment that was final and not subject to further appeal as of January 1, 2015.  (2) Any claims based on the failure to provide rest and recovery periods or pay for nonproductive time that were asserted in an action filed prior to July 1, 2013. (3) Any claims for unpaid wages, damages, and penalties that accrue after January 1, 2015.

The Draft Legislation did not include the specific date exclusion that was subsequently included in the enacted legislation in Labor Code § 226.2(g)(2)(A), or the fictitious worker claim exclusion subsequently included in § 226.2(g)(5).  However, according to the parties stipulated facts in this case, the Draft Legislation was never finalized into bill format and was never introduced in the California Legislature.  (Doc. No. 62-2 at 7, ¶ 21.)

The following year, Assembly Bill 1513 ("AB 1513") was introduced in the California Legislature on or about March 5, 2015.  The initial version of AB 1513 did not mention piece-rate compensation and instead, proposed merely  to repeal obsolete workers' compensation study requirements.

On or about August 27, 2015, AB 1513 was amended to address piece-rate compensation and related issues.  In doing so, the drafters of AB 1513 sought to address, among other things, the scope of the affirmative defense provisions and whether those provisions would be applicable to any pending litigation, along with any corresponding limitations such as cut-off dates that should be established.  The need to address these issues existed for reasons independent of the United Farm Workers ("UFW") and any position that union may have taken.  (Doc. No. 62-2 at ¶ 23.)  In resolving these issues, the drafters of AB 1513 included a number of limitations to the

4

1    affirmative defense which were codified in Labor Code § 226.2(g).

2         The amended version of AB 1513 was a product of confidential discussions with groups

3    including the California Labor and Workforce Development Agency, labor unions, and employer

4    groups.  On September 30, 2015, the *Sacramento Bee* reported that the author of AB 1513,

5    Assembly Member Das Williams, stated that the exceptions to the affirmative defense provisions

6    were necessary to maintain the support of labor and that "there has to be a cutoff at some point,

7    and no matter what the cutoff point is, somebody's going to be left out."  (*Id.* at ¶ 27.)

8         The provisions of AB 1513 were codified at California Labor Code § 226.2 and became

9    effective on January 1, 2016 and remained in effect only until January 1, 2021 when that section

10   was automatically repealed.  Specifically, the version of § 226.2 in effect between January 1,

11   2016 and December 31, 2020 was automatically repealed under § 226.2(k), which provided:

12   "This section shall remain in effect only until January 1, 2021, and as of that date is repealed."

13   Cal. Lab. Code § 226.2(k), repealed January 1, 2021.[3]

14        3.    California Labor Code § 226.2 (Old Version)

15        Section 226.2 includes two primary provisions.  First, subdivision (a) provides that

16   employees compensated on a piece-rate basis must be compensated for rest and recovery periods

17   and other nonproductive time separate from any piece-rate compensation.  In addition, it

18   establishes certain wage statement requirements as well as a methodology for calculating wages

19   for these employees.

20        Subdivision (b) of § 226.2 provides that employers may assert an affirmative defense to

21   any claim for recovery of wages, damages, and penalties "based solely on the employer's failure

22   to timely pay the employee the compensation due for rest and recovery periods and other

23   nonproductive time," so long as the employer complies with certain requirements by December

24   15, 2016.  Notably, in order for an employer to assert this affirmative defense, it must pay its

25   employees for previously uncompensated or undercompensated rest and recovery periods and

26   ―――――――――――――――――

27   [3]  To avoid confusion, unless otherwise specified, the court's references herein to § 226.2 refers to the version of that statute that was in effect between January 1, 2016 and December 31, 2020 (the "Old Version"), not the version of § 226.2 that became operative on January 1, 2021 and remains

28   in effect (the "Current Version").

other nonproductive time from July 1, 2012, to December 31, 2015, using one of two stated

formulas.  Cal. Lab. Code § 226.2(b)(1), repealed 2021.

Employers, however, under a number of circumstances cannot access the safe harbor and

those circumstances are enumerated in Labor Code § 226.2(g).  Two enumerated exceptions are

particularly relevant to this action:

> (2)   Claims based on the failure to provide paid rest or recovery periods or pay for other nonproductive time for which all of the following are true:
>
>> (A)   The claim was asserted in a court pleading filed prior to March 1, 2014, or was asserted in an amendment to a claim that relates back to a court pleading filed prior to March 1, 2014, and the amendment or permission for amendment was filed prior to July 1, 2015.
>>
>> (B)   The claim was asserted against a defendant named with specificity and joined as a defendant, other than as an unnamed (DOE) defendant pursuant to Section 474 of the Code of Civil Procedure, in the pleading referred to in subparagraph (A), or another pleading or amendment filed in the same action prior to January 1, 2015.
>
> * * *
>
> (5)   Claims for paid rest or recovery periods or pay for other nonproductive time that were made in any case filed prior to April 1, 2015, when the case contained by that date an allegation that the employer has intentionally stolen, diminished, or otherwise deprived employees of wages through the use of fictitious worker names or names of workers that were not actually working.

Cal. Lab. Code § 226.2(g), repealed 2021.

Section 226.2(b)(3) also requires that, in order to assert the affirmative defense, by July 1,

2016, "the employer [must] provide [ ] written notice to the [Department of Industrial Relations]

of the employer's election to make payments to its current and former employees in accordance

with the requirements of this subdivision and subdivision (c)."  Cal. Lab. Code § 226.2(b)(3),

repealed 2021.

## B.   Related Wage Dispute in *Aldapa*

Plaintiff Fowler is a named defendant in a related case concerning piece-rate

compensation that was filed on March 17, 2015 by agricultural piece-rate workers claiming in

1   part that Fowler had failed to pay wages due for rest periods and other nonproductive time.  *See*

2   *Aldapa v. Fowler Packing Co., Inc.*, No. 1:15-cv-00420-DAD-SAB, Compl., Doc. No. 2 (E.D.

3   Cal. Mar. 17, 2015).  In addition, the plaintiffs in *Aldapa* alleged Fowler willfully used fictitious

4   worker names (referred to as "ghost workers" or "muertitos") in order to undercompensate

5   employees who were actually working.  *Id.* ¶¶ 32–34.  Because the complaint in *Aldapa* was filed

6   prior to April 1, 2015, and because the complaint contained so-called "ghost worker claims"

7   relating to the use of fictitious worker names, the affirmative defense set forth in § 226.2(b) was

8   unavailable to Fowler in the *Aldapa* case, pursuant to § 226.2(g)(5).  (*See also* Doc. No. 1, ¶ 27)

9   (alleging that "[b]ut for this April 1, 2015 carve out [in § 226.2(g)(5)], Fowler would be protected

10   by AB 1513's statutory safe harbor").

11          The parties in *Aldapa* reached a settlement in that case, and on August 4, 2022, the

12   plaintiffs filed a motion for preliminary approval of the parties' class action settlement, which the

13   court granted on January 12, 2013.  (*Aldapa*, Doc. Nos. 278, 283.)  On April 14, 2023, the

14   plaintiffs filed a motion for final approval of the parties' class action settlement, and the final

15   approval hearing is currently scheduled for June 5, 2023.  (*Aldapa*, Doc. Nos. 291, 292.)

16   **C.     Procedural Background**

17          On January 22, 2016, plaintiffs Fowler and Gerawan commenced this action against

18   defendants David M. Lanier, in his official capacity as Secretary of the California Labor and

19   Workforce Development Agency ("LWDA"); Christine Baker, in her official capacity as the

20   Director of the California Department of Industrial Relations; and Julie A. Su, in her official

21   capacity as California Labor Commissioner.  (Doc. No. 1.)[4]  Specifically, plaintiffs through this

22   action challenge subdivisions (g)(2) and (g)(5) of California Labor Code § 226.2 under the United

23   States Constitution and the California Constitution.  First, plaintiffs allege that subdivisions (g)(2)

24   and (g)(5) violate the Equal Protection Clause of the Fourteenth Amendment to the United States

---

25   [4]  Defendants Lanier, Baker, and Su no longer hold their respective offices.  The individuals
26   currently holding the positions held by the original defendants are:  Stewart Knox, Katie Hagen,
     and Lilia Garcia-Brower.  Accordingly, the court will now order that the current office holders be
27   substituted in place of the former officer holders.  *See* Fed. R. Civ. P. 25(d) (providing that if "a
     public officer who is a party in an official capacity . . . ceases to hold office while the action is
28   pending . . . [t]he officer's successor is automatically substituted as a party.").

1   Constitution and Article 1, § 7 of the California Constitution.  (*Id.* ¶ 52.)  Second, plaintiffs assert

2   that these same subdivisions violate the prohibition against bills of attainder of Article I, § 10 of

3   the United States Constitution and Article I, § 9 of the California Constitution.  (*Id.* ¶ 59.)

4   Finally, plaintiffs assert that these subdivisions of California Labor Code § 226.2 violate Article

5   IV, § 16 of the California Constitution because they are impermissible laws of special

6   applicability.  (*Id.* ¶ 66.)

7          On March 7, 2016, defendants filed a motion to dismiss plaintiffs' complaint, which the

8   court granted on July 8, 2016.  (Doc. Nos. 10, 33.)  In that dismissal order this court concluded

9   that the plaintiffs did have Article III standing to bring their claims and rejected defendants'

10   argument to the contrary.  (Doc. No. 30 at 7.)  Next, plaintiffs conceded that Eleventh

11   Amendment immunity applied as to their state law claims and that the court lacked jurisdiction in

12   that regard, resulting in the dismissal of those state law claims.  (*Id.* at 7–8.)  This court also

13   found that the challenged provisions, Labor Code § 226.2(g)(2) and (g)(5), did not constitute

14   legislative punishment and on that basis dismissed plaintiff's bill of attainder claim.  (*Id.* at 12–

15   14.)  Finally, this court concluded that the challenged provisions survived rational bases review

16   and that no cognizable equal protection claim had been stated.  (*Id.* at 8–12.)  In particular, as to

17   plaintiff Fowler's challenge to § 226(g)(5)'s carve-out still at issue in this case the undersigned

18   stated:

19
20         In considering the universe of potential cases involving claims for
           failure to pay wages due for rest and recovery periods and other
21         nonproductive time, the legislature could have concluded that there
           existed a legitimate state interest in allowing a subset of those cases
           to proceed through litigation.  Certainly, the legislature could have
22         decided that employers facing both claims for failure to pay wages
           for nonproductive time and ghost worker claims should not be
23         afforded the same affirmative defense as those defending claims for
           lost wages only.  Such a distinction clearly finds a rational basis and
24         would not have been so unrelated to the legislature's broader goal of
           addressing the potential increase in litigation so as to bar its adoption.
25         As defendants point out, the legislature may have been particularly
           sensitive to allegations involving the improper use of fictitious
26         worker names to diminish employee compensation.

27         Moreover,  allegations  that  an  employer  intentionally  stole,
           diminished, or otherwise deprived employees of wages through the
28         use of fictitious worker names pose unique challenges related to the
           later calculation of lost wages.  Because the safe harbor provision of

                                             8

Labor Code § 226.2 requires determination of either "actual sums due" or an "employee's gross earnings," any calculation of lost wages may be potentially inaccurate where an employer is also accused of intentionally altering pay records. *See* Cal. Lab. Code § 226.2(b)(1). Thus, it is entirely reasonable for the legislature to have elected to treat cases involving ghost worker allegations differently from other piece-rate compensation cases.

Finally, plaintiffs argue that the classification of claims under subdivision (g)(5) based on the date a claim is asserted—April 1, 2015—is arbitrary and intended solely to preclude use of the statutory affirmative defense in the *Aldapa* case. Plaintiffs suggest that the legislature should have applied such an exception to all cases involving ghost worker claims. (Doc. No. 16 at 29–30.) But, despite plaintiffs' protestations, the April 1, [2015][5] deadline serves a rational purpose. First, it is clear that in light of the concerns described above, the legislature needed to set some limitation as to when ghost worker claims could be made. Without a limit, as defendants point out, employees seeking lost piece-rate compensation could have simply included these additional allegations for the sole purpose of denying an employer the ability to take advantage of the statutory affirmative defense. Furthermore, the decision to select April 1, 2015, as opposed to any other date, is reasonable, and the court finds it unnecessary to question the process that resulted in the legislature's adoption of this time limitation. The legislature is necessarily engaged in the business of line drawing, and any delineation would have led to a distinction between employers who would be allowed to assert an affirmative defense and those who would not. *See Beach*, 508 U.S. at 315 ("Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'") (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). The legislative classification of employers based on allegations of improper use of fictitious worker names under subdivision (g)(5) is rational and related to a legitimate state interest for purposes of equal protection. *See Nordlinger*, 505 U.S. at 10.

(*Id*. at 11-12.)

On July 13, 2016, plaintiffs filed a notice of appeal of this court's order of dismissal, seeking review by the U.S. Court of Appeals for the Ninth Circuit. (Doc. No. 36.) On December 20, 2016, the Ninth Circuit reversed this court's dismissal order as to plaintiff's equal protection

/////

---

[5] The court's order contained a typographical error erroneously stating the date in question as April 1, 2014.

1    claim[6], holding that "the only conceivable explanation for AB 1513's carve-outs is that they were

2    necessary to procure the UFW's support in passing that legislation" and "that justification would

3    not survive even rational basis scrutiny[.]"  *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 816

4    (9th Cir. 2016).  Indeed, the panel went so far as to say, "we cannot imagine a plausible legitimate

5    basis for the package of legislative classifications set by the legislature in AB 1513's carve-outs,

6    which requires us to conclude that Plaintiffs have alleged a plausible equal protection claim."  *Id.*

7    at 815, n.3.  Thus, the Ninth Circuit concluded that plaintiffs' complaint plausibly stated a claim

8    that the carve-out provisions violated the Equal Protection Clause and remanded the case to this

9    district court for further proceedings as to that claim.  *Id.* at 816, 819.

10        On September 15, 2017, the parties filed cross-motions for summary judgment.  (Doc.

11    Nos. 62, 64.)  Both parties filed their respective oppositions on October 13, 2017.  (Doc. Nos. 65,

12    66.)  On October 17, 2017, the *amicus curiae* brief in opposition to plaintiffs' motion for

13    summary judgment and in support of defendants' motion for summary judgment was filed on

14    behalf of the class of certified workers in two actions that were then pending before this court.

15    (Doc. No. 67-1.)  Replies were filed by both parties on October 27, 2017.  (Doc. Nos. 71, 73.)

16    Plaintiffs filed a response to the *amicus curiae* brief on November 7, 2017.  (Doc. No. 74.)  The

17    court held a hearing on the pending cross-motions on November 21, 2017 and took the motions

18    under submission.  (Doc. No. 76.)  The motions remained under submission for several years, and

19    during that time, the parties in *Aldapa* reached a settlement of that case, and the Old Version of

20    § 226.2 was repealed and replaced with the Current Version, which does not include the

21    affirmative defense provisions or the carve-outs that are at issue in this action.  On October 20,

22    2022, the court directed the parties to file a joint status report addressing these changed

23    circumstances, which they did on November 3, 2022 and again on January 26, 2023.  (Doc. Nos.

24    92, 95, 98.)

25        On March 27, 2023, plaintiff Fowler filed a petition with the Ninth Circuit requesting the

26    issuance of a writ of mandamus directing this court to rule on the pending cross-motions for

27    _____

28    [6]  The Ninth Circuit affirmed this court's order dismissing plaintiff Fowler's bill of attainder
      claim.  844 F.3d at 816-19.

1    summary judgment.  (Doc. No. 99); *Fowler Packing Co. v. U.S. Dist. Ct. for the E.D. of Cal.*, No.

2    23-70047, Pet., Doc. No. 1-2 (9th Cir. Mar. 27, 2023).  On May 2, 2023, the Ninth Circuit

3    granted Fowler's petition for a writ of mandamus and directed this court to rule on the pending

4    summary judgment motions by May 29, 2023.  (Doc. No. 102.)  The Ninth Circuit also provided

5    that this court "may order any supplemental briefing and hold any additional hearings it deems

6    appropriate."  (*Id.*)  At this court's direction, the parties provided supplemental briefing.  (Doc.

7    Nos. 104, 105, 106.)  A further hearing on the pending motions was held on May 22, 2023, at

8    which attorney David Schwarz appeared on behalf of plaintiff Fowler, and California Deputy

9    Attorney General Lara Haddad appeared on behalf of defendants.  (Doc. No. 108)[7]

10   /////

11

12   ─────────────────────

[7]  Having considered the parties' respective arguments with regard to whether this action has been
rendered moot either by the parties' proposed settlement in *Aldapa* or by the repeal of the Old
Version of § 226.2, the court concludes that this action has not been rendered moot.  However
unlikely it may be, there remains a possibility that the court will deny the parties' motion for final
approval of the class action settlement in *Aldapa*, in which instance Fowler's inability to assert
the safe harbor affirmative defense would remain a live issue.  *See Selcke v. New England Ins.
Co.*, 2 F.3d 790, 791–92 (7th Cir. 1993) ("Until the settlement becomes final, however, the case is
not moot, since the settlement may never become final."); *see also Hunt v. Imperial Merch.
Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009) ("[W]e are not required to dismiss a live
controversy as moot merely because it may become moot in the near future.").  At the May 22,
2023 hearing, defendants' counsel argued that the decision in *Selcke* is not binding on this court
and there is no Ninth Circuit precedent requiring that the court find that this action is not moot
until the settlement in *Aldapa* is finally approved.  To this end, defendants cited *Serta Simmons
Bedding, LLC v. Casper Sleep Inc.*, 950 F.3d 849, 853 (Fed. Cir. 2020), a non-binding Federal
Circuit case, in their supplemental reply brief.  (Doc. No. 106 at 5.)  The court has reviewed the
decision in *Serta Simmons Bedding* and finds that it is distinguishable because, unlike the class
action settlement pending final approval in *Aldapa* or the contingent settlement agreement in
*Selcke*, the settlement in *Serta Simmons Bedding* was final—a done deal—when the district court
erroneously issued an order on pending motions.  *See Serta Simmons Bedding*, 950 F.3d at 853
(finding that *Selcke* was "distinguishable since [it] involved a settlement agreement that was not
yet binding").  In contrast, the settlement in *Aldapa* still requires final approval from the district
court.  *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) ("Federal Rule of Civil
Procedure 23(e) requires the district court to 'approve any settlement of a certified class' before
such a settlement becomes final.").  In addition, plaintiff is still challenging the Old Version of
§ 226.2 in this action, which continues to apply in the cases in which the affirmative defense was
timely asserted pursuant to the time periods provided in that statute.  *See Fodera v. Equinox
Holdings, Inc.*, No. 19-cv-05072-WHO, 2021 WL 23294, at *5 (N.D. Cal. Jan. 4, 2021)
("conclud[ing] that Equinox should be permitted to amend its affirmative defenses to include this
additional safe harbor defense").

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

### A.      Subject Matter Jurisdiction

In their motion for summary judgment, defendants first argue that they are entitled to summary judgment because plaintiffs lack subject-matter jurisdiction based on the State's sovereign immunity under the Eleventh Amendment.  (Doc. No. 62-1 at 14–24.)  According to

1  defendants, because none of the defendants have any meaningful role in implementing or

2  enforcing the challenged legislation, the exception that allows suits for prospective declaratory

3  and injunctive relief against state officers who are sued in their official capacities, to enjoin an

4  alleged ongoing violation of federal law under the decision in *Ex parte Young*, 209 U.S. 123

5  (1908), does not apply, and this action is barred.  (*Id.*)  Defendants also argue that plaintiffs lack

6  Article III standing because the injuries alleged here are not fairly traceable to the actions of any

7  named defendant.  (*Id.* at 18–20.)

8      In opposition, plaintiff argues that defendants' attack on subject-matter jurisdiction is

9  inappropriate because the issue has previously been litigated before this court, defendants failed

10  to appeal this court's rejection of their jurisdictional arguments to the Ninth Circuit, and nothing

11  in the record justifies disregarding the law of the case doctrine as to this issue.  (Doc. No. 65 at 9

12  –17.)  Plaintiff also asserts that the defendants can be sued under the *Ex parte Young* exception

13  because plaintiff's claim asserts that defendants are charged with the responsibility of enforcing

14  California's piece-rate wage laws and giving effect to the state law in question.  (*Id.* at 17–27.)

15      Here, the issue of whether plaintiffs have Article III standing and whether Eleventh

16  Amendment sovereign immunity bars suit reduces to the same basic question:  do defendants

17  have a direct connection to enforcement of the affirmative defense provided for by AB 1513 such

18  that any alleged injuries caused thereby are causally traceable to defendants?  Nonetheless, the

19  court will address the arguments with respect to standing and sovereign immunity separately.

20      1.  Standing and the Law of the Case Doctrine

21      "The law of the case doctrine generally prohibits a court from considering an issue that

22  has already been decided by that same court or a higher court in the same case."  *Stacy v. Colvin*,

23  825 F.3d 563, 567 (9th Cir. 2016).  In order for the doctrine to apply, a court must have decided

24  the issue in question explicitly or by necessary implication.  *United States v. Lummi Indian Tribe*,

25  235 F.3d 443, 452 (9th Cir. 2000).  However, application of the doctrine is discretionary, and a

26  trial judge's decision to apply the doctrine is reviewed for an abuse of discretion.  *Hall v. City of*

27  *Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012).

28  /////

14

In the order granting defendants' motion to dismiss, the undersigned declined to dismiss the complaint on grounds relating to standing and ripeness, finding that "the operation of § 226.2 serves to create an actual and concrete controversy as to whether plaintiffs have the right to assert the statutory affirmative defense in plaintiffs' related cases." (Doc. No. 33 at 7.) However, that prior order did not address whether subject-matter jurisdiction is lacking over plaintiffs' claims based on the State's Eleventh Amendment sovereign immunity. In fact, the undersigned explicitly declined to reach the issue of whether defendant Lanier was a properly named defendant in this action in the order granting defendants' motion to dismiss. (*Id.* at 15, n.4.)

Because this court previously considered only the issue of whether plaintiffs have standing and explicitly declined to consider whether defendants were properly named in this action, the law of the case doctrine does not preclude the court from considering the latter issue now. *Lummi Indian Tribe*, 235 F.3d at 452 (stating that the issue must have been decided explicitly or by implication in the previous disposition for the law of the case doctrine to apply). Moreover, it would be within this court's discretion to reconsider the issue in any event. *See Fazli v. ConocoPhillips Co.*, 369 F. App'x 814, 815 (9th Cir. 2010)[8] ("With respect to the district court's prior order, when the issue is one that previously was decided by the district court itself, application of the doctrine is discretionary."). Of course, "[t]he objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

Finally, this court is not precluded from considering arguments related to sovereign immunity because that issue was not considered by the Ninth Circuit on appeal from this court's dismissal order. Plaintiff Fowler appealed this court's order dismissing its equal protection and bill of attainder claims and focused their briefing on appeal on those issues, rather than addressing subject matter jurisdiction. Therefore, the Ninth Circuit's remand order did not address whether standing and subject matter jurisdiction were lacking, or whether defendant Lanier was immune

---

[8] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

1    from suit pursuant to the Eleventh Amendment.  (*See* Doc. No. 42.)  Though the *amici* raised

2    jurisdictional and immunity issues when they argued that the named defendants did not play a

3    sufficient role in enforcing the challenged state statute in their brief in support of defendants'

4    petition for rehearing, the Ninth Circuit did not reach those questions and instead issued a one-

5    page order summarily denying the petition for rehearing *en banc*.  (*See* Doc. No. 48.)

6            Plaintiffs argue that the Ninth Circuit should be deemed to have implicitly heard and

7    decided defendants' contention that subject matter jurisdiction is lacking, because it granted leave

8    to file the *amicus* brief, and then subsequently denied plaintiffs' request for rehearing.  (Doc. No.

9    65 at 12–13.)  At least in this circumstance, however, the Ninth Circuit's silence does not

10   preclude this court from considering subject matter jurisdiction on remand.  *See Perkins v.*

11   *Standard Oil of Cal.*, 399 U.S. 222, 223 (1970) ("Our failure to make explicit mention in the

12   mandate of attorneys' fees simply left the matter open for consideration by the District Court, to

13   which the mandate was directed."); *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir.

14   1982) ("There is no reason, however, why our earlier silence did not simply leave the matter of

15   costs open for consideration by the district court on remand.").

16           As noted above, this court previously determined in the order granting defendants' motion

17   to dismiss that plaintiffs do not lack standing.  (Doc. No. 33 at 7.)  However, neither this court nor

18   the Ninth Circuit considered defendants' argument that plaintiffs lack a direct connection to the

19   enforcement of the affirmative defense provided under AB 1513 sufficient to provide a basis on

20   which to claim that plaintiff's alleged injuries stemming from that enforcement are causally

21   traceable to defendants.  Accordingly, this court is not prohibited from now considering whether

22   sovereign immunity applies by the law of the case doctrine.

23           2.    Eleventh Amendment Sovereign Immunity and Traceability

24           The Eleventh Amendment prohibits federal courts from hearing suits brought by private

25   citizens against state governments without the state's consent.  *Hans v. Louisiana*, 134 U.S. 1, 15

26   (1890); *Sofamor Danek Grp. v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997); *Nat. Res. Def.*

27   *Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 421 (9th Cir. 1996).  Application of Eleventh

28   Amendment immunity subjects a complaint to dismissal for lack of subject matter jurisdiction.

*Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 (9th Cir. 2003).  State immunity extends to state agencies and to state officers who act on behalf of the state.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142–46 (1993); *see also Flint v. Dennison*, 488 F.3d 816, 824–25 (9th Cir. 2007) (the Eleventh Amendment bars § 1983 damages claims against state officials in their official capacity); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (Eleventh Amendment immunity applies to state agencies); *cf. Durning v. Citibank, N.A.*, 950 F.2d 1419, 1422–23 (9th Cir. 1991) (noting that Eleventh Amendment immunity may not apply if the entity "is organized or managed in such a way that it does not qualify as an arm of the state").

However, the Eleventh Amendment does not bar suits against state officials sued in their individual capacity for acts taken during the course of their official duties.  *Hafer*, 502 U.S. at 31; *Stilwell v. City of Williams*, 831 F.3d 1234, 1245-46 (9th Cir. 2016); *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992).  Specifically, the Eleventh Amendment does not bar suit in federal court against a state officer accused of violating federal statutory or constitutional law.  *Ex parte Young*, 209 U.S. at 159–60.

The *Ex parte Young* doctrine is premised on the notion that states cannot authorize state officers to violate the Constitution and laws of the United States.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984*); *Sofamor Danek Grp*., 124 F.3d at 1183.  Accordingly, "when a plaintiff brings suit against a state official alleging a violation of federal law, the federal court may award prospective injunctive relief that governs the official's future conduct, but may not award retroactive relief that requires the payment of funds from the state treasury."  *Nat. Res. Def. Council*, 96 F.3d at 422; *see also Pennhurst*, 465 U.S. at 102–03; *Sofamor Danek Grp.*, 124 F.3d at 1184; *Pena*, 976 F.2d at 473 (emphasizing that the Eleventh Amendment does not bar suits seeking damages against state officials sued in their individual capacities).

To determine whether *Ex parte Young* applies, a court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  To invoke the *Ex parte Young* exception, the official sued

17

1    must have some connection to the enforcement of the allegedly unconstitutional act.  *Ex parte*

2    *Young*, 209 U.S. at 157; *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th

3    Cir. 2012).  This connection "must be fairly direct; a generalized duty to enforce state law or

4    general supervisory power over the persons responsible for enforcing the challenged provision

5    will not subject an official to suit."  *Coal. to Defend Affirmative Action*, 674 F.3d at 1134 (quoting

6    *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

7           Whether plaintiff Fowler's claims here are barred by Eleventh Amendment immunity is

8    dependent on the scope of defendants' authority in relation to the enforcement of § 226.2.  Here,

9    plaintiff seeks declaratory and injunctive relief from three state officers in their official capacities:

10   David M. Lanier, in his official capacity as Secretary of the LWDA; Christine Baker, in her

11   official capacity as the Director of the California Department of Industrial Relations; and Julie A.

12   Su, in her official capacity as California Labor Commissioner.  (Doc. No. 1 at 4.)[9]  Plaintiff

13   argues that these individuals are not immune from suit because they are "charged with enforcing

14   California's piece-rate wage and hour laws—including the statutory penalty provisions from

15   which AB 1513's safe harbor provides protection—and with implementing the safe harbor itself."

16   (Doc. No. 65 at 18.)  Defendants, on the other hand, argue that the *Ex parte Young* exception does

17   not apply because none of the named state officials have any specific and direct connection to the

18   enforcement of the challenged state law.  (Doc. No. 62-1 at 16.)

19          For the reasons explained below, the court concludes that defendants' role in giving effect

20   to the safe harbor provisions of the challenged statute subjects them to suit, regardless of whether

21   defendants are specifically responsible for enforcing the affirmative defense provisions of that

22   /////

23   /////

24   /////

25   _____

26   [9]  As noted above, during the pendency of this litigation, these named individuals have ceased to hold office in these positions, and pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted in the current office holders as named defendants:  Stewart Knox, the Secretary of the LWDA; Katie Hagen, the Director of Industrial Relations; and Lilia Garcia-Brower, the California Labor Commissioner.

27

28

18

statute.[10]  *See Eu*, 979 F.2d at 704.  In *Eu*, the Los Angeles County Bar Association brought suit against California's Governor and Secretary of State challenging the constitutionality of a state statute that prescribed the number of judges on the Los Angeles County Superior Court.  *Id.* at 699.  The Los Angeles County Bar Association asserted that the challenged statute resulted in a shortage of judges, causing extreme delays in civil litigation, and violating the due process and equal protection rights of civil litigants in that court.  *Id.*  The Ninth Circuit found that neither the Governor nor the Secretary of State were immune from suit, even though neither had the authority to enforce the statute by setting the number of judges in Los Angeles Superior Court. *Id.* at 704–05.  In this regard, it was clear that the Governor was limited by statute as to the number of judges he could appoint, and the Secretary of State merely had the duty to certify subsequent elections for judicial positions created by the California Legislature.  *Id.* at 704.  The Ninth Circuit concluded that these actions were sufficient to give effect to the challenged statute, and thus, the Governor and the Secretary of State were properly subject to suit.  *Id.*

As discussed in more detail below, the Labor Commissioner and the Director of Industrial Relations both give effect to AB 1513, and the LWDA Secretary demonstrates supervisory and independent authority in carrying out the provisions of that statute.  All of the defendants named in this action have the responsibility to enforce the AB 1513's safe harbor provision and thus, to determine its scope and applicability.  *See* Cal. Lab. Code §§ 90.7, 96.7, 98(a).  These responsibilities are sufficient to give effect to the challenged statute and, therefore, defendants are not entitled to immunity from suit with respect to this action under the Eleventh Amendment.

---

[10]  The court does note that the California Labor Commissioner does have the authority to bring enforcement actions against employers for violation of piece-rate wage laws.  *See* Cal. Lab. Code § 98(a) ("The Labor Commissioner is authorized to investigate employee complaints.  The Labor Commissioner may provide for a hearing in any action to recover wages, penalties, and other demands for compensation, including liquidated damages if the complaint alleges payment of a wage less than the minimum wage fixed by an order of the Industrial Welfare Commission or by statute, properly before the division or the Labor Commissioner, including orders of the Industrial Welfare Commission, and shall determine all matters arising under his or her jurisdiction."); Cal. Lab. Code § 96.7 ("The Labor Commissioner, after investigation and upon determination that wages or monetary benefits are due and unpaid to any worker in the State of California, may collect such wages or benefits on behalf of the worker without assignment of such wages or benefits to the commissioner.").

The California Labor Commissioner has the authority to investigate employee complaints and hold a "hearing in any action to recover wages, penalties, and other demands for compensation . . . ." Cal. Lab. Code § 98(a). Based on the authorization provided by Labor Code § 96.7, the Labor Commissioner has the power to collect wages or benefits for workers after conducting an investigation and determining that wages or benefits are due. As a result of this authority, the Labor Commissioner may also bring enforcement actions against employers for violation of piece-rate wage laws. *See id;* Cal. Lab. Code § 98(a). In deciding whether to bring such an enforcement action, the Labor Commissioner would need to make a determination of whether the employer can properly assert the affirmative defense provided for by the Old Version of § 226.2. Further, employers who wish to raise the affirmative defense are required to submit payment to the Labor Commissioner for any employee they cannot locate. Cal. Lab. Code § 226.2(b)(4), repealed 2021. By deciding whether the affirmative defense applies in enforcement actions and receiving payment for the assertion of the affirmative defense, the Labor Commissioner was not executing a general duty to enforce state law and instead, demonstrated a specific connection to the statute and gives it effect. *Cf. Am. Canine Found. v. Sun*, 3:06-cv-04713-MMC, 2007 WL 549749, at *2 (dismissing an action brought against California's public health veterinarian because his "only connection to the challenged law is the receipt of statistics with respect to dog bites.").

Similarly, the Director of Industrial Relations has broad responsibilities to give effect to California's piece-rate wage requirements and AB 1513's safe harbor provision under the Old Version of the statute. In this regard, the Director of Industrial Relations is required to "administer and enforce all laws imposing any duty, power, or function upon the offices or officers of the department." Cal. Lab. Code § 59. The Director had a responsibility to "advise the Insurance Commissioner and request than an audit be ordered" whenever it is determined that "an employer has violated Section 226.2." Cal. Lab. Code § 90.7. To determine whether an employer had violated § 226.2, the Director must have necessarily determined the scope and applicability of the safe harbor provision. The Director's role in determining whether an employer could properly avail itself of the safe harbor provision under the Old Version of the

20

statute establishes a specific connection to the challenged statute such that she is not entitled to Eleventh Amendment immunity. *See Eu*, 979 F.2d at 704 (finding that state officers were not entitled to Eleventh Amendment immunity with respect to a challenged statute that prescribed the number of superior court judges because the officers named as defendants had specific connections to the challenged statute in that one had a duty to appoint judges to any newly-created judicial positions, and the other had a duty to certify subsequent elections for those positions); *see also Coal. to Defend Affirmative Action*, 674 F.3d at 1134 ("Yudof has a 'fairly direct' connection, to say the least, to the enforcement of section 31. [citation omitted]. As the head of the University of California, he does more than just "live with" section 31. He enforces it.").

Finally, the LWDA Secretary has similarly broad powers to effectuate § 226.2, because both the Director of Industrial Relations and the Labor Commissioner are subordinate to him. *See* Cal. Gov't Code § 15554. A state official may be subject to suit based on their supervisory responsibilities and independent ability to enforce the law. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013). In *Harris*, the plaintiffs had brought an action against the State of California, the Governor, and the Attorney General, seeking to enjoin enforcement of a statutory ban on foie gras. *Id.* at 943. The Ninth Circuit found that the Governor only had a general duty to enforce California law and thus lacked a direct connection to the challenged statute. *Id.* at 943. However, the court determined that under Article V, § 13 of the California Constitution, the state Attorney General had "direct supervision over every district attorney" as well as the authority "to prosecute any violations of law . . . whenever she believes that the law is not being adequately enforced." *Id.* (internal quotations omitted). Based upon that determination, the Ninth Circuit concluded that the Attorney General's duty to prosecute established that the exception under *Ex Parte Young* applied. *Id.* Here, the LWDA Secretary's authority to directly enforce the powers and duties of departments and officers of the LWDA is a parallel to the Attorney General's supervisory authority over other district attorneys found by the Ninth Circuit in *Harris* to be sufficient to invoke the *Ex Parte Young* exception to Eleventh Amendment immunity. *Id.* at 943-44. Further, the LWDA Secretary has broad authority to carry

21

1    out the purposes of California Labor Code, which includes § 226.2, similar to how the Attorney

2    General in *Harris* was found to have the duty and the power to prosecute whenever she believed

3    that the challenged law was not being adequately enforced.  *Harris*, 729 F.3d at 943–44.  The

4    LWDA Secretary's supervisory responsibilities and independent authority to carry out the

5    purposes of the challenged statute therefore makes him subject to suit in this action.  *See Coal. to*

6    *Defend Affirmative Action*, 674 F.3d at 1134 (holding that the president of the University of

7    California was not entitled to Eleventh Amendment immunity because he had a direct role in

8    enforcing the challenged provision, he supervised employees who followed it, and there was no

9    other entity to commence enforcement proceedings).

10          State officials are not entitled to Eleventh Amendment immunity from suit where

11   enforcement of the challenged statute is possible but is not imminent.  The fact that these state

12   officials did not bring enforcement proceedings against plaintiff Fowler "under the challenged

13   statute does not preclude . . . suit" even where the challenged statute is not the type "that gives

14   rise to enforcement proceedings."  *Eu*, 979 F.2d at 704.  Moreover, despite not having brought

15   any enforcement actions, the Labor Commissioner certainly had the power to do so under § 96.7

16   of the California Labor Code, which authorizes the Commissioner to "collect . . . wages or

17   benefits" on behalf of any worker "after investigation and upon determination that wages or

18   monetary benefits are due and unpaid."  Cal. Lab. Code § 96.7.  There are no additional

19   "imminence" requirements for when the plaintiffs may bring a suit against a state official for

20   declaratory relief, apart from a general prudential analysis of ripeness, once it has been

21   determined that the state officials are not shielded by Eleventh Amendment immunity.  *See Nat'l*

22   *Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846 (9th Cir.), *opinion amended on denial of reh'g*,

23   312 F.3d 416 (9th Cir. 2002) (holding that a suit was not barred against the Director of the

24   California Department of Fish and Game even though state officials were not currently pursuing

25   enforcement actions and there was not a "present threat" of enforcement of the challenged

26   statute).

27          In finding that defendants are not immune from suit, this court diverges, at least in part,

28   from determinations made by the district court in *Sandoval v. Lanier*, No. 5:16-cv-02309-JGB-

1   SP, 2017 WL 8186677 (C.D. Cal Aug. 9, 2017).  In *Sandoval*, the plaintiffs had asserted four

2   causes of action on behalf of a putative class against the same three defendants named in this

3   action.  2017 WL 8186677, at \*1–2.  There, the plaintiffs alleged that due to their employers'

4   compliance with the affirmative defense requirements of the safe harbor provision, piece-rate

5   workers were being deprived of their statutory right to minimum wage.  *Id.* at \*2.  The district

6   court in *Sandoval* reviewed several cases and ultimately concluded that although the named

7   defendants had a general duty to enforce California's labor, occupational safety, and wage laws,

8   "California law does not provide them with a role in either enforcing Section 226.2(b), or giving

9   effect to the affirmative defense it provides."  *Id.* at \*6.  As a result, the district court in *Sandoval*

10  found that defendants were immune from suit and that based on a similar analysis, plaintiffs also

11  lacked standing to sue.  *Id.* at \*7–8.

12      This court declines to follow the reasoning of the district court in *Sandoval* for several

13  reasons.  In analyzing the role that defendants have in connection to enforcing the challenged

14  affirmative defense provisions, that court concluded that "Defendants' role in relation to

15  § 226.2(b) is purely administrative."  *Id.* at 9.  The undersigned disagrees with that

16  characterization.  As discussed at length above, the California Labor Commissioner, the Director

17  of Industrial Relations, and the Secretary of the LWDA have both direct and supervisory

18  responsibilities, including, but not limited to, the power to bring enforcement actions for violation

19  of piece-rate wage laws (*see* Cal. Lab. Code § 98(a)), and to request an audit if an employer has

20  violated § 226.2 (*see* Cal. Lab. Code § 90.7).  The exercise of each of these statutory powers

21  would require that defendants necessarily determine if an employer was entitled to invoke the

22  safe harbor provision.  This alone, in the undersigned's view, demonstrates a "specific

23  connection" with the challenged statute such that the defendants' actions must be said to give

24  effect to the statute.  *See Eu*, 979 F.2d at 704.

25      Even if defendants' role in relation to § 226.2 was purely administrative, they would still

26  not be immune to suit under the Eleventh Amendment.  The Ninth Circuit has never considered a

27  defendant's administrative responsibilities to preclude suit.  In *Eu*, the Ninth Circuit found that

28  the Secretary's duty to certify election results was "a specific connection to the challenged

23

1   statute" such that she was subject to suit. *Eu*, 979 F.2d at 704. The roles that defendants are

2   tasked with in relation to § 226.2, such as receiving payment from employers who wish to raise

3   the affirmative defense for wages due any employee the employer cannot locate (Cal. Lab. Code

4   § 226.2(b)(4)), or receiving written notice from employers who wish to avail themselves of the

5   affirmative defense (Cal. Lab. Code § 226.2(b)(3)), are no more administrative or ministerial than

6   the Secretary's duty to certify election results addressed by the Ninth Circuit in *Eu.*

7          Finally, the undersigned concludes that even if the ultimate power to enforce the safe

8   harbor provision of California Labor Code § 226.2 lies with the courts, the defendants named in

9   this action are not entitled to Eleventh Amendment immunity. The district court's dismissal of

10   the action in *Sandoval* was based largely on the reasoning that § 226.2(b) expressly creates an

11   affirmative defense to certain claims, which can only be raised by an employer in a judicial

12   proceeding. *Sandoval*, 2017 WL 8186677, at *7. The district court in *Sandoval* reasoned that the

13   court in which the affirmative defense was asserted, not the named defendants, would ultimately

14   be responsible for the "'enforcement' of the safe harbor provision—i.e., evaluation of the merits

15   of an employer-defendant's asserted defense." *Id.* The undersigned also disagrees with this

16   reasoning since courts are not the exclusive agents that may give effect to the affirmative defense.

17   Though the scope and applicability of the safe harbor will often be evaluated by the court in

18   which the affirmative defense is eventually asserted, the initial determination of whether an

19   employer may avail itself of the affirmative defense may be made much earlier by the Labor

20   Commissioner, the Director of Industrial Relations, or the Secretary of the LWDA—before any

21   litigation is initiated. For example, the affirmative defense may be raised in an enforcement

22   proceeding for unpaid piece-rate wages, meaning that the Labor Commissioner would then have

23   to determine whether the defense applies. Indeed, taken to its logical extension, the fact that a

24   court may be the ultimate arbiter of whether an affirmative defense is validly asserted would

25   appear to ensure that no state officer could ever fall within the *Ex parte Young* exception, since

26   courts are always, as a practical matter, the final arbiter of how laws are applied.

27          For these reasons, the undersigned declines to adopt the conclusion reached by the district

28   court in *Sandoval* and instead finds that the named defendants in this action are not entitled to

1    immunity from suit under the Eleventh Amendment.

2            Accordingly, the court will deny defendants' motion for summary judgment in its entirety.

3    **B.    Equal Protection**

4            "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

5    'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

6    direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

7    *Living Ctr.*, 473 U.S. 432, 439 (1985)*; see also Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th

8    Cir. 2001).  "[A] classification neither involving fundamental rights nor proceeding along suspect

9    lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993); *see*

10   *also United States v. Hancock*, 231 F.3d 557, 566 (9th Cir. 2000).  Here, on appeal from this

11   court's dismissal order, the Ninth Circuit applied the rational basis standard because the

12   challenged provision of AB 1513 implicates neither a suspect class nor a fundamental right.

13   *Fowler*, 844 F.3d at 814-15 (citing *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir.

14   2013)).

15           Employing rational basis scrutiny, a statutory classification must be upheld so long as

16   "there is any reasonably conceivable state of facts that could provide a rational basis for the

17   classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  Thus, under this

18   highly deferential standard,

19           the Equal Protection Clause is satisfied so long as there is a plausible
             policy reason for the classification, the legislative facts on which the
20           classification is apparently based rationally may have been
             considered to be true by the governmental decisionmaker, and the
21           relationship of the classification to its goal is not so attenuated as to
             render the distinction arbitrary or irrational.
22

23   *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (citations omitted)*; see also Armour v. City of*

24   *Indianapolis*, 566 U.S. 673, 680 (2012).  The party challenging the rationality of a legislative

25   classification bears the burden "to negative every conceivable basis which might support it."

26   *Beach*, 508 U.S. at 315 (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364

27   (1973))*; see also Heller*, 509 U.S. at 320; *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185

28   (9th Cir. 2011).

1    In its order remanding this case, the Ninth Circuit concluded that plaintiffs' claim brought

2    under the Equal Protection Clause should not have been dismissed under rational basis review.

3    *Fowler*, 844 F.3d at 814.  In reaching this conclusion, the Ninth Circuit considered potential

4    justifications for including the carve-outs provided for by § 226.2(g)(2) and (g)(5).  *Id.* at 815–16.

5    Regarding § 226.2(g)(2)(A), defendants explained that "the government sought to protect

6    expectations developed as a result of already-pending litigation and to prevent unlimited relief to

7    employers." *Id.* at 815.  However, the Ninth Circuit did not find this justification at all

8    convincing and concluded instead that "[p]laintiffs have plausibly alleged that the choice of cut-

9    off dates *can only be explained* as a concession to the UFW in exchange for its support for AB

10   1513," which would be an insufficient rational basis.  *Id.* (emphasis added).  The Ninth Circuit

11   observed that "[e]ach cut-off date corresponds, within a matter of weeks (or even a matter of

12   days), to the corresponding filing dates of the cases against Fowler, Gerawan, and Delano." *Id.*

13   With regard to subsection (g)(2)(B), the Ninth Circuit noted that defendants-appellees could not

14   offer any explanation as to why the provision was included and, in the absence of any such

15   explanation, that court could not "conceive" any other purpose for § 226.2(g)(2)'s language than

16   to "keep other employers from being carved out of the safe harbor being denied to Fowler,

17   Gerawan, and Delano." *Id*.

18   Similarly, the Ninth Circuit found that defendants' proffered explanation for § 226.2(g)(5)

19   was also wholly unsatisfactory, concluding that any concerns about ghost worker claims were

20   completely unrelated to whether certain defendants could invoke the safe harbor provision.  *Id.*  In

21   particular, the Ninth Circuit found "section (g)(5)'s reliance on particular allegations directed to a

22   completely unrelated claim as the basis for denying an affirmative defense" to be particularly

23   suspect.  *Id.*  The Ninth Circuit therefore concluded that plaintiffs' claim brought in this action

24   plausibly states a claim that these provisions violate the Equal Protection Clause.  *Id.*

25   Though defendants continue to articulate the same plausible rationales for the enactment

26   of the challenged provisions by the Legislature, those rationales were already considered and

27   rejected by the Ninth Circuit in this case.  Moreover, defendants have offered no evidence in

28   support of those rationales in opposition to plaintiff's motion for summary judgment.  Finally,

26

defendants have not articulated any new "conceivable basis which might support" the carve-outs, and thus have not shifted the burden to plaintiff to negate any such new rationales.  *See Beach*, 508 U.S. at 315.  The parties before the court[11] have stipulated that the California Legislature needed to adopt time limitations as to the affirmative defense provided in § 226.2(b) in order to limit and define with clarity the extent that existing and future wage litigation would be impacted by the legislation.  (Doc. No. 62-2 at 7, ¶ 18.)  Additionally, the parties have stipulated that the specific time limitations ultimately adopted were necessary in order to garner the UFW's support of the legislation.  (*Id.* at 8, ¶ 27.)  Both of these considerations were specifically discussed by the Ninth Circuit in its opinion reversing this court's order dismissing the equal protection claim.

As they did before the Ninth Circuit, defendants argue that it is reasonably conceivable that the cut-off date appearing in § 226.2(g)(2), March 1, 2014, which excluded former plaintiff Gerawan, was selected to minimize the impact that a new affirmative defense would have on pending litigation.  (Doc. No. 62-1 at 27–28.)  Defendants also contend that the California Legislature was required to set the boundaries of the legislation at some fixed point in time, and that doing so, alone, is sufficient for the provision to pass rational basis review.  (*Id.* at 28.)  But, according to the Ninth Circuit's opinion, this reasoning contradicts established principles regarding the Equal Protection Clause.  Despite the need for classifications, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.  The Ninth Circuit pointedly observed in this case that despite having a legitimate interest in setting a limitation on the affirmative defense provided, "legislatures may not draw lines for the purpose of arbitrarily excluding individuals. . . ."  (Doc. No. 42 at 12.)  In light of the Ninth Circuit's analysis in its decision on appeal from this court's prior order dismissing plaintiff Fowler's equal protection claim, the court must reject defendants' reasoning that the need to draw a line somewhere results in any line passing rational basis review.

/////

---

[11]  The court again expresses its view, and related concern, that the Legislature itself is not represented in this action.

On summary judgment,[12] as before the Ninth Circuit, defendants have been unable to explain why the specific cut-offs that would permit a party to avail itself of the affirmative defense are all different, lending itself to the inference that such lines were drawn by the California Legislature in order to purposefully exclude plaintiff Fowler from accessing the affirmative defense created by the legislation.  For instance, defendants still have yet to provide any explanation for why a defendant is only excluded from the safe harbor provision of the Old Version of § 226.2 if it also was named with specificity prior to January 1, 2015.  *See* § 226.2(g)(2)(B).  Further, defendants have failed to explain why the July 1, 2015 cut-off for claims by amendment was set for July 1, 2015, especially in light of the contention by plaintiff Fowler that this cut-off date disrupts, rather than preserves settlement expectations.  (*See* Doc. No. 64 at 25–26.)  Instead of selecting a uniform cut-off date, which would support the idea of simply making a necessary delineation, the deadlines for various portions of the carve-outs all differ, giving rise to the implication that the classification is "so attenuated as to render the distinction arbitrary or irrational."  *Nordlinger*, 505 U.S. at 11.

At the pleading stage, the Ninth Circuit analyzed the challenged provisions and found that it simply could conceive of no legitimate justification for the specificity requirement except for the improper purpose of denying Fowler, Gerawan, and Delano access to the safe harbor in violation of their right to equal protection.  *Fowler*, 844 F.3d at 816.  Defendants have still failed to proffer any legitimate explanation, much less come forward with any evidence, showing why the cut-off dates are all different, other than for the purpose of excluding plaintiff from relying on the affirmative defense.  Without such an explanation from defendants, supported by evidence and in light of the Ninth Circuit's quite direct opinion in this case, this district court simply has no

---

[12]  At the May 22, 2023 hearing, defendants emphasized that the burden on plaintiffs at the summary judgment stage is higher than the burden on plaintiffs at the pleadings stage.  Defendants referred the court to the decision in *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018), which specifically addressed the Ninth Circuit's decision in *Fowler*, stating that "the burden on Plaintiffs here to come forward with evidence that negates every conceivable basis for the law is much higher than that of the Fowler Packing plaintiffs opposing a motion to dismiss."  While the quoted statement from the decision in *Allied Concrete* is accurate, this court has applied the applicable legal standard governing summary judgment in this order.

1    choice but to now find that as a matter of law the carve-outs to the affirmative defense violate the

2    Equal Protection Clause.[13]

3         Despite reaching this conclusion, the court must still determine whether the offending

4    carve-out provisions are severable from the remainder of the Old Version of § 226.2.

5    **C.      Severability**

6         Plaintiff argues that the unconstitutional carve-outs in the Old Version of § 226.2(g) are

7    severable from the affirmative defense provisions.  (Doc. No. 64 at 28.)[14]

8         It is important to recognize at the outset that the determination of whether an

9    unconstitutional provision in a state statute is severable is solely a matter of state law, and that in

10   California, there is a presumption in favor of severability.  *See Briseno v. City of Santa Ana*, 6

11   Cal. App. 4th 1378, 1384 (1992) ("Invalid provisions of a statute should be severed whenever

12   possible to preserve the validity of the remainder of the statute.").  The existence of a severability

13   clause establishes a presumption in favor of severing the invalid portions of a statute rather than

14   nullifying it in its entirety.  *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (2011).

15   However, the existence of a severability clause "plus the ability to mechanically sever the invalid

16   part while normally allowing severability, does not conclusively dictate it."  *Santa Barbara Sch.*

17   *Dist. v. Superior Court*, 13 Cal. 3d 315, 331 (1975).

18        Here, AB 1513 itself does not contain a severability clause, but the California Labor Code,

19   which AB 1513 amended and is therefore a part of, does have a general severability clause.  *See*

20   Cal. Lab. Code § 24 ("If any provision of this code, or the application thereof to any person or

21   circumstances, is held invalid the remainder of the code, and the application of its provisions to

22   other persons or circumstances, shall not be affected thereby.").  Neither party has cited binding

23   _____

24   [13]  As noted above, it has been obvious to this court since the inception of this litigation that no
     counsel for any party in this action represents the California Legislature – the body that enacted
25   the challenged provision only after extensive negotiations and the passage of more than a year in
     time.

26

27   [14]  Defendants do not address this argument in their opposition to plaintiff's motion for summary
     judgment.  However, the court did grant leave to the non-parties to file an *amicus* brief addressing
28   this issue.  (Doc. No. 67-1.)  Plaintiffs then requested and were permitted to file a response to that
     *amicus* brief.  (Doc. No. 74.)

1   precedent as to whether a general, or omnibus, severability clause is enforceable under California

2   law.[15]  Because consideration of this factor is not dispositive and there is no controlling

3   precedent, the court will defer deciding the impact of the omnibus severability clause.

4         Next, under California law, courts are to consider whether a provision is "grammatically,

5   functionally, and volitionally" separate from the remaining portions of a law when deciding

6   whether the provision is severable.  *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir.

7   2014) (interpreting California law).  All three criteria must be satisfied in order to sever the

8   invalid provision.  *McMahan v. City & Cnty. of San Francisco*, 127 Cal. App. 4th 1368, 1374

9   (2005).  To be grammatically severable, a provision must "constitute[] a distinct and separate

10  provision . . . which can be removed as a whole without affecting the wording of any other

11  provision."  *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 822 (1989).  Plaintiff contends that

12  AB 1513's carve-outs are contained in separate stand-alone provisions and thus their removal

13  would not change or impact the meaning of other parts of the statute.  (Doc. No. 64 at 29.)  *Amici*

14  do not dispute that the challenged provision is grammatically severable.  (Doc. No. 67-1 at 22.)

15  The court agrees.

16        Functional severability requires that after severing the invalid portion, the remaining

17  provisions of the statute "must be capable of separate enforcement."  *Vivid Ent.*, 774 F.3d at 576.

18  That is,

19        [t]he part to be severed must not be part of a partially invalid but
          unitary whole.  The remaining provisions must stand on their own,
20        unaided by the invalid provisions nor rendered vague by their
          absence nor inextricably connected to them by policy considerations.
21        They must be capable of separate enforcement.

22  *People's Advocate, Inc. v. Superior Court*, 181 Cal. App. 3d 316, 332 (1986).  Here, plaintiff

23  argues that because "AB 1513 contains numerous provisions that have nothing to do with the

24  carve-outs . . . [s]evering these carve-outs would thus leave the remainder of the statute

25  _____

26  [15]  Plaintiff cites the decision in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012)
    as an example of a situation in which courts have held that an omnibus severability clause
27  supports severance.  (Doc. No. 74 at 13.)  However, this is a United States Supreme Court
    decision applying federal law and does not stand as authority for how general severability clauses
28  should be interpreted under California law.

completely intact . . . ."  (Doc. No. 64 at 29.)  While *amici* state in conclusory fashion that they do not find the challenged section to be functionally severable, they do not advance any argument explaining why, in their view, AB 1513 cannot stand on its own without the carve-out provisions. (Doc. No. 67-1 at 22.)  Here, the carve-out provisions to the affirmative defense are isolated in a subsection of § 226.2 and merely indicate as to what groups of employers the previous sections are inapplicable.  Moreover, the carve-out provisions do not include any definitions or explanatory terms that apply to the remainder of AB 1513.  In addition, the remainder of AB 1513 is not "rendered vague" after removing the carve-outs, nor incapable of separate enforcement. *See People's Advocate Inc.*, 181 Cal. App. 3d at 332.  Therefore, the court is satisfied that the provision is functionally severable.

Finally, the provision must be volitionally severable, meaning that after excluding the invalid section, "the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute, . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable."  *Santa Barbara Sch. Dist.*, 13 Cal. 3d at 331 (citations and quotation marks omitted); *Calfarm Ins. Co.*, 48 Cal. 3d at 821.  According to the California Supreme Court, "*Santa Barbara* stands for the proposition that if a part to be severed [and therefore saved] reflects a 'substantial' portion of the [legislature]'s purpose, that part can and should be severed and given operative effect."  *Gerken v. Fair Pol. Pracs. Com.*, 6 Cal. 4th 707, 715 (1993); *see also Santa Barbara Sch. Dist.*, 13 Cal. 3d at 331–332 ("[I]t seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose.").

As the California Supreme Court has subsequently explained:

> [T]he [remaining valid] provisions to be severed must be so presented to the [legislature] in the [bill] that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment.  *The test is whether it can be said with confidence that the [legislature's] attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions.*

*Gerken*, 6 Cal. 4th at 714–15.  In other words, "[t]he issue, when assessing volitional separability,

31

1   is not whether a legislative body would have preferred the whole to the part; surely it would have,

2   . . . .” *Cal. Redevelopment Ass'n*, 53 Cal. 4th at 273.  “Instead, the issue is whether a legislative

3   body, knowing that only part of its enactment would be valid, would have preferred that part to

4   nothing, or would instead have declined to enact the valid without the invalid.”  *Id.*

5          To decipher the legislature's “preference” or determine whether its “attention was

6   sufficiently focused” on the portion to be saved, courts look to the statute's text, “the 'intended

7   function of [the] particular statutory scheme'” and the effect severance has on that intended

8   function, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 817–19 & n.10 (9th Cir. 2013), any

9   “express policy statement or declaration of purpose,” *Gerken*, 6 Cal. 4th at 717, and legislative

10  materials, *see Cal. Redevelopment Ass'n*, 53 Cal. 4th at 273 (concluding that a legislative act of

11  enacting a severability clause trumped evidence of legislative history that possibly suggested the

12  remaining provisions in the bill were not severable); *Mendoza v. State of California*, 149 Cal.

13  App. 4th 1034, 1063–64 (2007) (explaining that the court was “guided by the legislative history”

14  to determine that the remaining valid provisions of California's Romero Act were not severable);

15  *Inst. of Governmental Advocs. v. Bowen*, No. 2:09-cv-00693-FCD-DAD, 2009 WL 1664073, at

16  *4 (E.D. Cal. June 15, 2009) (noting that “legislative history is highly relevant to th[e] inquiry” of

17  volitional severability).

18         Here, *amici* argue that the carve-outs are not volitionally severable because the California

19  Legislature drafted AB 1513 in a manner so as to balance the competing interests of all

20  stakeholders with respect to the legislation and that the statute could not have been passed without

21  the carve-outs.  (Doc. No. 67-1 at 22.)  Specifically, *amici* argue that,

22
            the stipulated facts show that the legislature drafted AB 1513 so as
23          to balance the competing interests of employers, employees,
            management, and labor groups and determined that they had to
24          include the carve-outs to offset the burden that the 'safe harbor'
            provision placed on employees who had already devoted significant
25          time and resources litigating their wage and hour claims.

26  (*Id.*)  In support of this argument, *amici* cite to an article published in the Sacramento Bee on

27  September 30, 2015, titled “How Jerry Brown and farmers settled a major wage dispute,” which

28  plaintiff attached as an exhibit to its complaint (*see* Doc. No. 1-1 at 15), and which included

1    statements made by state officials, lawmakers, and industry stakeholders regarding the passage of

2    AB 1513.  (Doc. No. 67-1 at 22–23.)  That article described the passage of AB 1513 as a

3    "multimillion dollar compromise," noting that the bill's author, Assemblymember Das Williams,

4    estimated that approximately $200 million in back pay were due to workers, whereas "farm

5    industry officials feared their liability could reach five times that amount or more."  (Doc. No. 1-1

6    at 15.)  In addition, as the parties have included in their stipulated facts in connection with the

7    pending motions, that article also reported that Assemblymember Williams had stated that the

8    exceptions to the affirmative defense provisions were necessary to maintain the support of labor

9    and that "there has to be a cutoff at some point, and no matter what the cutoff point is,

10   somebody's going to be left out."  (*See* Doc. No. 62-2 at 8, ¶ 27.)  *Amici* also points to the parties'

11   stipulated facts regarding the Draft Legislation, which included an affirmative defense but not the

12   carve-outs, because that draft was circulated to some members of the Legislature in August 2014

13   but was never finalized into bill format and was never introduced in the Legislature.  (Doc. No.

14   67-1 at 23) (citing Doc. No. 62-2 at ¶¶ 20–21).  According to *amici*, these stipulated facts

15   describe how "a specific bill providing for the safe harbor without the carve-outs was proposed to

16   the Legislature, but did not have enough support to even be formally introduced."  (Doc. No. 67-1

17   at 23.)  *Amici*, however, do not point to any evidence as to *why* the Draft Legislation was not

18   finalized into bill format nor to evidence reflecting that a lack of sufficient support for that

19   draft—presumably support from interest groups, though *amici* does not specify—was the reason

20   the draft was not finalized and introduced.

21        Plaintiff Fowler disagrees with *amici*'s arguments, and on the specific question of

22   severability, defendants also disagree with *amici*'s position and join with plaintiff Fowler in

23   arguing that the carve-outs are volitionally severable from the statute.  (Doc. Nos. 74 at 12–14; 71

24   at 16.)  Plaintiff Fowler contends that *amici* did not provide evidentiary support for their bald

25   assertion that the Legislature "never intended for the safe harbor provision to exist without" to

26   carve-outs.  (Doc. No. 74 at 12–13.)  According to plaintiff Fowler, "[n]othing in the stipulated

27   facts, the legislative history, or the publicly-available record supports this proposition," and "[t]he

28   /////

legislative history is devoid of any mention of the carve outs or why they were included." (*Id.* at 13.)

In addition, as to the stipulated facts, plaintiff Fowler essentially argues that *amici* improperly extrapolates from those cited facts and draws conclusions that are not actually supported by any evidence before the court. (*Id.*) For example, plaintiff Fowler objects to *amici*'s assertion that plaintiff Fowler "admits that the carve-outs were part of a 'grand compromise' needed for passage of the law." (Doc. No. 74 at 13, n.2) (citing Doc. No. 67-1 at 24). Plaintiff Fowler explains that "[t]he stipulated facts state only that the carve outs 'were necessary in order to help avoid the UFW's opposition to the bill,'" but "[t]he fact that the UFW threatened to oppose AB 1513 unless Plaintiffs were excluded from the affirmative defense does not mean that the bill would have failed if the Legislature had not given into the UFW's demands." (*Id.*) In other words, plaintiff Fowler contends that *amici* take a step too far by concluding that because the carve-outs were necessary to garner UFW's support for the bill, the carve-outs were therefore necessary for the passage of the bill. The missing link in that chain of logic—and for which plaintiff Fowler contends *amici* offer no evidence—is that UFW support was necessary for the Legislature to pass AB 1513.

At the May 22, 2023 second hearing on the pending motions, plaintiff Fowler emphasized that the evidence before the court establishes that the central purpose of AB 1513 was to create an affirmative defense, and that it is not at all clear the Legislature would have been *unwilling* to pursue that goal in the face of opposition from UFW. Plaintiff Fowler noted that this purpose is reflected in Assemblymember Williams's September 14, 2015 letter transmitting AB 1513 to the governor for signature, which plaintiff also attached as an exhibit to its complaint filed in this action. (*See* Doc. No. 1-1 at 2.) In the first paragraph of that transmittal letter, Assemblymember Williams stated that "AB 1513 provides a short window of time for employers to make back wage payments to workers for rest and recovery breaks and other nonproductive time, in exchange for relief from statutory penalties and other damages." (*Id.*) The letter then proceeds to explain that AB 1513 "provides a means to resolve" the issues that arose in the wake of the state appellate court decisions in *Gonzalez* and *Bluford*, namely the increased liability on employers

and the uncertainty of whether and when workers would be able to recover back pay.  (*Id.*)  The

letter further explained that AB 1513 provided for piece-rate workers to receive "larger and more

timely back pay recoveries than could be expected through litigation" and "relieves employers of

related liability for statutory penalties and damages for past violations."  (*Id.* at 2–3.)  That is, the

compromise reached in AB 1513 accomplished the purpose the Legislature sought to achieve.  In

urging the court to void only the carve-out provisions and allow the affirmative defense to

survive, plaintiff Fowler maintains that "[s]triking down the affirmative defense would undo this

achievement, while exposing workers to claims of disgorgement and exposing employers to

having made untraceable (or unrecoverable) payments in reliance on the safe harbor."  (Doc. No.

74 at 14.)

The court has now carefully reviewed the evidence before it on summary judgment and

agrees only to a limited extent with plaintiff Fowler that the court does not have conclusive

evidence before it clearly establishing that the Legislature would not have passed AB 1513 if the

carve-outs were not included in the bill.  On the other hand, the legislative history of the Draft

Legislation in 2014 would certainly appear at first blush to at least suggest that the Legislature

would not have passed AB 1513 without the carve-outs; after all, that draft included an

affirmative defense but no carve-outs, and that draft was not the version of the bill that advanced

in, and was passed by, the Legislature.  However, it is also true that the stipulated facts and

evidence before the court on summary judgment merely establish that the Draft Legislation "was

circulated to some members of the California Legislature" and "sought to address, among other

things, whether the affirmative defense provisions would be applicable to any pending litigation,

and what limitations should be established."  (Doc. No. 62-2 at 7, ¶ 20.)  As noted, it is

undisputed that the Draft Legislation "was never finalized into bill format and was never

introduced in the Legislature."  (*Id.* at 7, ¶ 21.)  The parties have attached a copy of the Draft

Legislation to their stipulated facts, and it is worth pointing out that the form cover page by the

Office of Legislative Counsel for this draft bill has the box checked to indicate that this draft was

an "Unbacked bill," stating:  "The attached bill draft has not been backed for introduction.  When

a Member has decided to introduce this bill draft, the draft should be returned to the Office of

35

1  Legislative Counsel as soon as possible so that it can be prepared for introduction by that

2  Member."  (Doc. No. 1-1 at 5.)  There is no evidence before the court on summary judgment that

3  any of the members who received circulation of this draft decided to introduce this bill.  Given

4  the parties' stipulated fact that the bill was never introduced, the evidence taken together

5  implicitly suggests that none of those members decided to introduce the bill.  Moreover, there is

6  no evidence before the court regarding the reasons those members of the Legislature had for not

7  introducing the bill, let alone evidence that they were motivated not to do so due to any UFW

8  expressed opposition to the draft based on the lack of carve-outs to preclude certain companies

9  (including plaintiff Fowler) from asserting the affirmative defense created by the bill.  As a result,

10  the court does not view the Draft Legislation as conclusive evidence that the California

11  Legislature would not have passed AB 1513 absent the carve-out provisions.  *See Calfarm Ins.*

12  *Co.*, 48 Cal. 3d at 822 (finding an insolvency provision unconstitutional but the remainder of the

13  statute severable because "[t]here [wa]s no persuasive reason to suppose the insolvency standard

14  was so critical to the enactment of Proposition 103 that the measure would not have been enacted

15  in its absence"); *see also Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 957

16  (9th Cir. 2009) (finding that even though the legislative history indicated that certain provisions

17  found to be unconstitutional were "designed to help the Act withstand a [different type of]

18  constitutional challenge," it did not "necessarily indicate that [the legislature] would not have

19  passed the Act but for the inclusion of these sections"), *aff'd sub nom. Brown v. Ent. Merchants*

20  *Ass'n*, 564 U.S. 786 (2011).

21         Moreover, although the parties in this action have stipulated that the carve-outs were

22  included in AB 1513 in order to garner the support of UFW for the bill, there is no evidence

23  before the court that the Legislature viewed the carve-outs as the driving force and purpose for

24  the legislation.  Indeed, the legislative history would appear to suggest otherwise.  *See Est. of*

25  *Graham v. Sotheby's Inc.*, 860 F. Supp. 2d 1117, 1126 (C.D. Cal. 2012) (analyzing the legislative

26  history of a California law to determine whether the state legislature would not have enacted the

27  law without the provision deemed unconstitutional); *see also Mendoza*, 149 Cal. App. 4th at

28  1063–64; *Inst. of Governmental Advocs.*, 2009 WL 1664073, at *4.  As noted, AB 1513 was

36

1   amended on August 27, 2015 to include provisions addressing the piece-rate compensation issues

2   that arose after the spring 2013 decisions in *Gonzalez* and *Bluford*, and the key pieces of

3   legislative history following that amendment, specifically the bill analyses prepared for the senate

4   and assembly labor committees, as well as the senate floor analysis and the assembly floor

5   analysis, are at least some evidence illustrative of the Legislature's intent and purpose with

6   respect to this bill.[16]   In this regard, the senate labor committee's AB 1513 bill analysis dated

7   September 2, 2015 stated the "key issue" as follows:

8
> Should the Legislature clarify the statutory requirements for piece-
> rate compensation?
9

10
> Should the Legislature provide an affirmative defense and safe
> harbor for employers who, by December 15, 2016, fully compensate
> their employees, as specified, for all under-compensated or
11
> uncompensated rest periods, recovery periods, or unproductive time
> between July 1, 2012 and December 31, 2015?
12

13   *See* Sen. Labor and Industrial Relations Comm., B. Analysis of AB 1513, Sept. 2, 2015, 2015–

14   2016 Reg. Sess. (Cal. 2015).  That analysis summarized the then 2013 decisions in *Gonzalez* and

15   *Bluford* and the concerns that were raised regarding the impact of those decisions—concerns that

16   AB 1513 sought to address.  (*Id.* at 2, 4–5.)  In summarizing what the bill will do, that analysis set

17   forth the circumstances in which the affirmative defense would not apply, i.e., the carve-out

18   provisions, but there was no discussion regarding why those carve-outs were included in the bill

19   and why they mattered.  (*Id.* at 3.)  In the senate labor committee's AB 1513 bill analysis for the

20   _____

21   [16]  The court takes judicial notice of the bill analyses, which are available on the California
Legislative Information website, and which are the proper subject of judicial notice.  *See* Fed. R.

22   Evid. 201(b)–(c); *Anderson v. Holder*, 673 F.3d 1089, 1094 (9th Cir. 2012) ("Legislative history
is properly a subject of judicial notice."); *City & Cnty. of San Francisco v. Garland*, 42 F.4th

23   1078, 1083 n.3 (9th Cir. 2022) (taking judicial notice of a document obtained from an official
government website).  Specifically, the court takes judicial notice of the following:  (1) Sen.

24   Labor and Industrial Relations Comm., B. Analysis of AB 1513, Sept. 2, 2015, 2015–2016 Reg.
Sess. (Cal. 2015); (2) Sen. Labor and Industrial Relations Comm., B. Analysis of AB 1513, Sept.

25   10, 2015, 2015–2016 Reg. Sess. (Cal. 2015); (3) Assemb. Comm. on Labor and Employment, B.
Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015); (4) Assemb. Floor

26   Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015); and (5) Sen. Floor

27   Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015).  All of these documents
are available at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=2015201

28   60AB1513.

following week, dated September 10, 2015, there was again no mention of the purpose for including the carve-out provisions, though there was for the first time a reference to the carve-outs in the section of the analysis that summarized the arguments of opponents. *See* Sen. Labor and Industrial Relations Comm., B. Analysis of AB 1513, Sept. 10, 2015, 2015–2016 Reg. Sess. (Cal. 2015). Under that section, the analysis stated:

> While acknowledging that AB 1513 would allow employers to come into compliance and avoid continued exposure from non-productive time wage claims, opponents argue that AB 1513 contains provisions that unfairly excludes participation by some agricultural employers. Opponents argue that safe-harbor exclusions, as expressly inserted by use of the March 1, 2014 date sacrifices some companies to continued legal exposure in exchange for legal protections afforded to others. Opponents also point to the provision excluding any company for which an active claim is open alleging the adding of "ghost" employees to reduce or eliminate employee wages from use of payment calculation formulas and exposure protections afforded by AB 1513.

(*Id.* at 7.) Similarly, in the assembly labor committee's AB 1513 bill analysis dated September 11, 2015, there is extensive discussion regarding the impact of the spring 2013 decisions in *Gonzalez* and *Bluford* and the then still unresolved need for legislation to address the concerns raised regarding back pay for workers and increased liability on employers. Nonetheless, there was no explanation or discussion regarding the carve-outs at that time other than in the summary of the opponent arguments. *See* Assemb. Comm. on Labor and Employment, B. Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015). The opponent arguments were stated as follows:

> Opponents argue that although this bill would allow employers to come into compliance and avoid continued exposure for unpaid wage claims, it contains troubling provisions that unfairly exclude participation by some agricultural employers. Opponents argue that these arbitrary provisions set forth a troubling precedent that represents political targeting that sacrifices some companies to continued legal exposure in exchange for legal protections afforded to others. In particular, opponents argue that these provisions are an attempt to single out two agricultural employers for retribution, by leaving them exposed to multi-million dollar damage claims and penalties, while eliminating similar liability threats faced by dozens of other similarly-situated growers. Opponents state that, whatever the intent behind these changes, the result in unfair and unconstitutional.

1   (*Id.* at 7.)  Finally, the senate floor analysis and the assembly floor analysis included the same

2   information and explanations as the committees' analyses, and neither provide an explanation as

3   to why the carve-outs were included, even in the face of the opposition arguments.  *See* Assemb.

4   Floor Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015); *see also* Sen.

5   Floor Analysis of AB 1513, Sept. 11, 2015, 2015–2016 Reg. Sess. (Cal. 2015).  In each of the

6   committees' analyses and in the senate floor analysis, there is section at the end in which

7   supporters and opponents are separately listed and the UFW is not listed as a supporter or

8   opponent in any of them.  Taking into consideration this legislative history, and the absence of

9   any discussion regarding the importance of the carve-out provisions or the purpose for including

10  them in the bill, this court concludes that it has not been established on summary judgment that

11  the carve-outs were the driving force motivating the Legislature to pass this bill.[17]

12        The inclusion of the carve-outs may very well have been necessary to secure UFW's

13  support for the bill, and perhaps UFW's support was necessary as a political reality of the deal-

14  making and compromising behind closed doors that led to the passage of AB 1513.  But the legal

15  standard under California law, the standard that this court must apply, focuses *not* on whether the

16  Legislature *would have* garnered enough support for legislation if the unconstitutional provisions

17  were not included, but rather "whether a legislative body, knowing that only part of its enactment

18  would be valid, *would have preferred that part to nothing*."  *See Cal. Redevelopment Ass'n*, 53

19  Cal. 4th at 273 (emphasis added); *see also Gerken*, 6 Cal. 4th at 715 ("*Santa Barbara* stands for

20  the proposition that if a part to be severed [and therefore saved] reflects a 'substantial' portion of

21  the [legislature]'s purpose, that part can and should be severed and given operative effect.").  *Cf.*

22  *Abbott Lab'ys v. Franchise Tax Bd.*, 175 Cal. App. 4th 1346, 1358–60 (2009) (holding that a state

23  statute that violated the commerce clause was not volitionally severable because deleting the

24  offending language would "rewrite[] the statute to give the statute a purpose quite different than

25  the one enacted by the legislature" and "[i]t therefore ceases to serve the function intended by the

26  legislature"); *see also Vivid Ent., LLC*, 774 F.3d at 574 ("Because a court may not use

27  ───────────────

28  [17]  It remains at the very least unclear whether the parties before the court in this action were actually motivated to offer any evidence that may exist addressing this issue.  *See* fn. 11, above.

1  severability as a fig leaf for judicial legislation, courts have fashioned limits on when a statute

2  may be severed.")

3        Here, based solely on the limited evidence before this court on summary judgment, the

4  purpose of AB 1513 was the codification of piece-rate compensation and the creation of a safe

5  harbor affirmative defense in response to concerns raised following the 2013 decisions in

6  *Gonzalez* and *Bluford*.  The purpose of that legislation was not the carve-outs, which as claimed

7  by plaintiff Fowler targeted a select few employers and prohibited them from asserting the

8  affirmative defense created by the statute.  It follows that elimination of the carve-outs cannot be

9  said to disrupt the statutory scheme or negate its purpose.  *See Briseno*, 6 Cal. App. 4th at 1384

10 (finding that a portion of state housing law was unconstitutional but that the remaining valid

11 portions could be severed because the unconstitutional provision did "not affect the overall

12 statutory scheme"); *see also Nat'l R.R. Passenger Corp. v. Su*, 289 F. Supp. 3d 1130, 1140 (E.D.

13 Cal. 2017) ("[I]n passing the California Act, the Legislature referenced specific rationales and

14 economic benefits associated only with these remaining provisions, which demonstrates volitional

15 separability.").

16       Accordingly, the court concludes that the carve-out that is applicable to plaintiff Fowler—

17 Old Version § 226.2(g)(5)[18]—is severable.[19]  The court will therefore grant plaintiff Fowler's

18 /////

19 /////

20 /////

21 /////

---

22 [18]  At the hearing on May 22, 2023, plaintiff Fowler conceded that it lacks standing to challenge

23 the carve-out that was applicable to Gerawan, Old Version § 226.2(g)(2).

24 [19]  As should be clear by now, the undersigned reaches this conclusion somewhat reluctantly and

25 based upon both a faithful application of the legal standards governing the severability
   determination under California law and the evidence actually presented by the parties on

26 summary judgment.  This judge continues to believe that it is plausible (given the magnitude and
   difficulty of the problem the California Legislature was still trying to solve at the end of session

27 in 2015 following the spring of 2013 decisions in *Gonzalez* and *Bluford*) that the Legislature—as
   a political reality—may not have been willing to pass AB 1513 without the UFW's lack of

28 opposition, which the parties here have stipulated hinged on inclusion of the carve-outs.

1   motion for summary judgment and declare Old Version § 226.2(g)(5) void based on violation of

2   the Equal Protection Clause. [20]

3                                    **CONCLUSION**

4        For the reasons stated above:

5   1.     Defendants' motion for summary judgment (Doc. No. 62) is denied in its entirety;

6   2.     Plaintiff's motion for summary judgment (Doc. No. 64) is granted;

7   3.     Subsection (g)(5) in the version of the California Labor Code § 226.2 in effect

8          between January 1, 2016 and December 31, 2020 is void based on violation of the

9          Equal Protection Clause, and that subsection is severable from the remainder of

10         that statute;

11  4.     The Clerk of the Court is directed to update the docket to reflect that the following

12         current office holders are substituted in as the named defendants in this action in

13         place of the prior officer holders:

14         a.     Stewart Knox, in his official capacity as Secretary of the California Labor

15                and Workforce Development Agency, is substituted in for the prior office

16                holder, David M. Lanier;

17         b.     Katie Hagen, in her official capacity as the Director of the California

18                Department of Industrial Relations, is substituted in for the prior office

19                holders, Christine Baker and Acting Director Andre Schoorl; and

20         c.     Lilia Garcia-Brower, in her official capacity as the California Labor

21                Commissioner, is substituted in for the prior office holder Julie A. Su; and

22  5.     The Clerk of the Court is directed to close this case.

23  IT IS SO ORDERED.

24  Dated:   **May 25, 2023**                    _____

25                                               UNITED STATES DISTRICT JUDGE

26  ---
[20] This conclusion has no impact on the Current Version of § 226.2, not only because the current
27  version of that statute is not being challenged in this action, but also because, as noted above, the
current version of California Labor Code § 226.2 does not include any of the provisions at issue
28  in this case—the safe harbor provisions and the carve-outs.

41